# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **DANIELE DePAOLIS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:16CV00409 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **C. B. KING, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Daniele DePaolis, Pro Se Plaintiff; Susan A. Waddell, Guynn & Waddell, P.C., Salem, Virginia, for Defendant Rose Dulaney, M.D.; and Margaret Hoehl O'Shea, Office of the Attorney General, Richmond, Virginia, for remaining Defendants.*

The plaintiff, Daniele DePaolis, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 against Virginia Department of Corrections ("VDOC") prison officials for using or allowing excessive force and providing inadequate medical care. After review of the record, I am of the opinion that certain of DePaolis' claims of excessive force must be tried to a jury. The claim against a prison doctor will be dismissed.

## I. BACKGROUND.

### A. Plaintiff's Evidence and Claims.

The following facts from the record are construed in the light most favorable to DePaolis for purposes of the defendants' motions for summary judgment. *See*

*Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). On November 4, 2014, at Wallens Ridge State Prison ("Wallens Ridge"), as DePaolis was exiting the chow hall after breakfast, Sergeant T. B. Smith called him aside. Smith demanded to know why DePaolis had not cut his hair, as Smith had ordered him to do the previous morning to comply with the prison's grooming requirements. DePaolis attempted to explain to Smith why he had not yet cut his hair as ordered. The recreation period after breakfast on November 3 had been only fifteen or twenty minutes. When DePaolis had asked an officer if he would bring out the "barber box," the officer had said, "Ya'll don't got enough time we'll do it tomorrow." Compl. ¶ 2, ECF No. 1. The November 4 morning recreation period, when DePaolis could ask for the barber box and cut his hair, was scheduled to begin after breakfast.

Smith ignored DePaolis' explanation and said, "I thought I told you not to come back to my chow hall until you cut your hair." *Id.* at ¶ 3. DePaolis explained that he had no food in his cell and did not want to go hungry. Smith said, "Are you getting smart with me?" *Id.* DePaolis said, "No," but Smith then ordered him to "cuff up," as Sergeant B. K. McCray stood nearby, "shaking a can of mace in an intimidating and aggressive manner with a scowl on his face." *Id.* at ¶ 3-4.

Smith and McCray handcuffed DePaolis and escorted him to the segregation unit. On the way, Smith made threats that he would "beat [DePaolis'] ass" and that

he wished DePaolis would "buck so I can slam you right on your fucking face!" *Id.* at ¶ 5. Smith begged DePaolis to "try me" and "[m]ake my day." *Id.* Smith and McCray placed DePaolis in the largest shower in the segregation unit, behind a metal, fence-like door. Correctional officers T. W. Hall and M. S. Byington then took possession of the tether attached to DePaolis' handcuffs. Both officers "yanked the security leash . . . causing [DePaolis] to get his hand caught on the bottom of the shower door which was causing severe pain and felt like it was about to snap [his] right wrist." *Id.* at ¶ 6. DePaolis "pulled his hand free to alleviate the pain and prevent potential harm" and "stuck his arm out of the slot per protocol in order for the cuffs to be taken off so that [he] could be strip searched for contraband." *Id.* at ¶ 7.

Byington and Hall ordered DePaolis to "strip down." *Id.* at 8. DePaolis "asked to speak with a captain/major or warden." *Id.* Ignoring this request, Byington "twisted [DePaolis'] arm completely as if he were trying to break it," and Hall "maced [the inmate] for about 30 to 40 seconds emptying the entire can of mace on [his] left arm, chest and face and neck." *Id.*

Lieutenant C. B. King arrived at the cell, and DePaolis explained the whole situation to him. King told DePaolis, "[Y]ou're either going to strip down or I'm gonna have my officers go in there and beat you like a punching bag! And try to knock some of your teeth out!" *Id.* at ¶ 9. When King then pulled out his mace,

"instinct . . . caused" [DePaolis] to block his face by putting his hands up palms facing [King] shielding [his] face for protection." *Id.* King "maced [DePaolis] for five (5) to 10 seconds," after which DePaolis turned his back to King, who kept spraying the mace for 20 to 30 seconds, with the substance striking the inmate's "shoulder blades and back of his head." *Id.* at ¶ 10. DePaolis pressed the shower button to wash off the mace to "cease the burning, however, to no avail." *Id.*

King taunted, "[A]re you coming out of the shower? Or do I need to keep macing you? [']Cause that'll be fun." *Id.* DePaolis asked again to speak with a captain, major, or the warden. King told his officers to "suit up and go in there and do like I said, and go 'get him.'" *Id.*

An extraction team of four officers, Hall, Byington, D. T. Davis, and T. R. Ledford, returned, dressed in riot gear. They "entered the shower, activated the shield for electrocution and hit [DePaolis] with electricity while all of [his] clothes were soaking wet. Shocking [him] repeatedly and severely causing excruciating pain all over [his] body." *Id.* at ¶ 11. Fearing "that electricity under wet circumstances could and would kill him, his pain momentarily took a back seat to his fear and [DePaolis] went into survival mode and with his hands moved the shield off of him at which time [his] right hand hit the riot helmet of [Davis] accidentally." *Id.* at ¶ 12.

Davis then put DePaolis "in a headlock with his left arm and punched [him] so many times so hard in the face with his right balled up fist that [DePaolis] can't count the punches." *Id.* at ¶ 13. The officers picked DePaolis up, then "slammed" him to the ground, and several of them "kicked and punched" the inmate. *Id.* DePaolis saw Davis kicking him with his right boot several times in the face. Even after Ledford restrained DePaolis' hands behind his back, officers continued punching and kicking him in his sides, while "jokingly yell[ing] 'stop resisting,'" in an attempt "to justify their actions to witnesses, and the hand held camera." *Id.* DePaolis shouted on camera, "My hands are already behind my back what more do you want from me?" *Id.* He alleges that King and Smith "sanctioned and supervised the beating" in the shower. *Id.* at ¶ 14.

Officers placed DePaolis in handcuffs and shackles and moved him to sit on a pod table so a nurse could assess his condition. While Smith held DePaolis' left hand, King grabbed and lifted the inmate's "right hand up and outward causing it to pop three (3) to four (4) times painfully." *Id.* The nurses came and asked what medical attention DePaolis needed, and an investigator took photographs of his face.

Then, officers took DePaolis to a cell, cut his clothes off with scissors, and placed him in "five (5) point restraints for not cutting his hair." *Id.* Ankle restraints were applied first. At that point, King "twisted [DePaolis'] right hand

upwards and out inflicting excruciating pain." *Id.* at ¶ 15. DePaolis "heard and felt another pop in his . . . wrist." *Id.* "Lt. Hughes feigned that he didn't see [King's] excessive force," and told DePaolis to sit up. *Id.* DePaolis said, "I can't. . . . He's . . . twisting my hand and wrist up and out." *Id.*

From the officers' actions on November 4, 2014, DePaolis allegedly suffered these injuries:

> Cuts from forehead down nose; wound left top lip under nose; mouth was busted; left nostril had a hairline fracture; unable to breathe out of left nostril for a week and a half to two weeks; had blood in left nostril from being fractured; couldn't move right wrist for two (20) and a half to three (3) weeks; to date, it turns purple and goes numb and swells up whenever rested at [his] side in a normal position; right wrist painfully pops and cracks whenever bent backwards slightly; due to being moved extensively and kicked and punched in the face and eye (left) vision is deteriorating by the day; black eye; right side of head busted open.

*Id.* at ¶ 16.

After the five-point restraints were in place, Officer J. Short "attempt[ed] to break [DePaolis'] right pinky . . . while [he] was in five (5) point restraints." Mot. Amend. 1-2, ECF No. 49. At least three times while DePaolis was in five-point restraints, Short "took it upon himself to weed through [DePaolis'] fingers on [his] right hand and grab [his] right pinky and attempt to break it." Aff. Resp. Mot. Summ. J. by J. Short ¶ 11, ECF No. 84. DePaolis states that Short's actions are depicted on available video footage and that they "inflict[ed] severe pain and injury to [his] right pinky" which to this day is still not aligned. *Id.*

After these events, Davis wrote a disciplinary charge against DePaolis for assault on a nonoffender, for hitting him in the head. A hearing officer conducted a hearing on the charge, found DePaolis guilty, and penalized him with the loss of ninety days of earned good conduct time. Smith wrote a disciplinary charge against DePaolis for failing to comply with an order to cut his hair. A hearing officer conducted a hearing on this charge, found DePaolis guilty, and penalized him with a reprimand. DePaolis contends that King and Smith conspired to cover up the use of excessive force against him by generating these "bogus" disciplinary charges, "falsify[ing]" incident reports, and "editing the hand held video camera's footage of the beating." Compl. ¶ 17, ECF No. 1.

DePaolis also alleges that Rose Dulaney, M.D., provided inadequate medical care for his wrist after the cell extraction on November 4, 2014. His exhibits indicate that the doctor examined him on November 5 to assess his complaints of pain in his wrist and back. The doctor ordered an X ray of his right hand. "The results were normal, no fractures or dislocation seen." Compl. Ex. at 69, ECF No. 1-1.

DePaolis complains that X rays "*cannot* uncover ligament, tendon or cartilage damage [he] evidently has." Compl. ¶ 19, ECF No. 1. He alleges that despite "numerous request[s] and complaints of pain and disability to his right wrist [Dr. Dulaney] refuse[d] to refer [him] for a more graphical imaging of an

M.R.I. to diagnose with specificity the cause of [his] pain and disability." *Id.* at ¶ 18. His exhibits include several administrative remedy forms on these issues. He told Dr. Dulaney that his right hand would turn purple and grow numb if held down to his side, and she said, "[H]uh that's strange your hand shouldn't be doing that I don't know what's wrong." Compl. Ex., 19, ECF No. 1-2. He grieved Dr. Dulaney's decision to order a second X ray to compare the results with those from his prior X ray. On January 23, 2015, DePaolis demanded an MRI instead, and refused to submit to a second X ray. On February 24, 2015, his grievance was ruled "unfounded," because the institutional physician must determine the proper course of treatment, and this finding was upheld on appeal on March 10, 2015, for the same reason. DePaolis also complains that "[d]espite the chronic pain, [he was] offered motrin which [did] not manag[e] the pain at all." Compl. ¶ 18. He does not allege or provide documentation for any meetings with or treatment decisions by Dr. Dulaney after January 23, 2015. In June 2015, DePaolis was transferred to Sussex I State Prison.

Liberally construing his Complaint, DePaolis claims the following violations of his constitutional rights: (1) use of excessive force and/or failure to intervene to prevent such force by defendants King, Hughes, Smith, McCray, Davis, Byington, Hall, Ledford, and Short; (2) conspiracy by King and Smith to falsify records, video, and disciplinary charges; and (3) deliberate indifference to serious medical

needs by Dr. Rose Dulaney.[1]  DePaolis seeks monetary damages, declaratory relief, and injunctive relief to have the officers prosecuted and to order an MRI of his nose and his right hand and wrist.

Dr. Dulaney has filed a Motion to Dismiss, and the other ("nonmedical") defendants have filed Motions for Summary Judgment, supported by affidavits and documentation.  DePaolis has responded to these motions, making them ripe for disposition.

   B.  The Non-Medical Defendants' Evidence on Summary Judgment.

On November 4, 2014, Smith saw DePaolis in the chow hall and asked him why he had not cut his hair as Smith had ordered him to do the previous day. DePaolis said, "Charge me, lock me up or whatever you want to do.  I am not going to cut my hair."  Mem. Supp. Mot. Summ. J. Ex. 8, Smith Aff. ¶ 11, ECF No. 47-8.  Smith then told him he would be placed in pre-hearing detention for being in violation of the grooming policy.  After officers placed DePaolis in the segregation shower and removed his handcuffs, Hall and King gave DePaolis

---

[1]  In the Complaint, DePaolis identified these individuals as defendants:  King, Hughes, McCray, Smith, Davis, Byington, Hall, Ledford, and "(John) Short."  Compl. 1, ECF No. 1.  Although he mentioned Dr. Dulaney in his pleading, DePaolis did not indicate that she was a defendant to the lawsuit.

After some service of process issues, counsel entered an appearance for all named defendants except Short.  In March 2017, DePaolis moved to amend to provide Short's first name and to state his claim against this defendant.  In a Second Motion to Amend, dated April 21, 2017, DePaolis moved to add Dr. Dulaney as a defendant.  The court granted these amendments and served the new defendants in July 2017.

several orders to remove his clothes, but he refused. King warned him that if he did not comply with orders, the officers would use OC spray and conduct a cell extraction.[2] DePaolis responded, "Fuck you, I ain't done nothing." Mem. Supp. Mot. Summ. J. Ex. 5, King Aff. ¶ 6, ECF No. 47-5.

Smith and King gave multiple orders for DePaolis to submit to the strip search and comply with procedures to exit the shower. DePaolis refused to comply. King administered a one-half second burst of OC spray, but DePaolis immediately began to decontaminate himself with the shower water. King ordered DePaolis to come to the shower door and be restrained. DePaolis responded, "I ain't doing shit." *Id.* at ¶ 7.

Davis "held the NOVA shield and was the first officer to enter" the shower, "us[ing] the shield as protection for [himself] and the other officers" following him. Mem. Supp. Mot. Summ. J. Ex. 2, Davis Aff. ¶¶ 5, 7, ECF No. 47-2. The officers state that DePaolis was aggressive and belligerent, shouting and cursing, and that he struck Davis in the head and actively fought against the officers to avoid being restrained.

Davis and other officers deny that the NOVA was activated at any time to cause electrical shock to DePaolis. They state that they placed DePaolis on the

---

[2] *See Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (listing effects of OC spray as including "immediate burning sensations to the mucous membranes, skin and inside the nose and mouth").

floor and applied arm and leg restraints. They insist that they used only the amount of force necessary to regain control over a recalcitrant inmate.

After the officers moved DePaolis from the shower, a nurse assessed him. The nurse noted an abrasion to DePaolis' forehead, another on the bridge of his nose, and a knot on his right cheek bone. The nurse cleaned the abrasions and applied a topical ointment. She noted DePaolis' complaint of right wrist pain, but observed no swelling or deformities.

Short states that "[n]o force was used when [DePaolis] was placed in 5 point restraints." Mem. Supp. Mot. Summ. J. Ex. 1, Short Aff. ¶ 5, ECF No. 80-1. Short restrained DePaolis' hands, while another officer applied the leg restraints. DePaolis remained in the five-point restraints until 7:05 a.m. on November 5, but was released several times during that period. Each time the restraints were replaced, a nurse checked his condition, and one ordered pain medication and referred him to the doctor for evaluation of his right wrist. Mem. Supp. Mot. Summ. J Ex. 7, Stanford Aff. ¶¶ 6-11, ECF No. 47-7.

A few hours after DePaolis' release from restraints on November 5, Dr. Dulaney examined him. She noted complaints of pain in his back, wrist, and face, and his demand for a facial MRI. The doctor recorded these observations: "superficial scratches," his nose appeared "well-aligned," "no facial defects or contusions," "edema to his right wrist," "range of motion . . . limited in all

directions," and "slight contusion cuff marks around his wrist." *Id*. at ¶ 12, ECF No. 47-7. Dr. Dulaney ordered an X ray of the right wrist, but noted that facial X rays were not necessary. She also ordered ibuprofen for fourteen days.

The X ray of DePaolis' right wrist was completed on November 7. Dr. Dulaney noted on November 19 that the results of that X ray were negative and that the patient should be so notified.

DePaolis was transferred in June 2015 from Wallens Ridge to Sussex I State Prison, and later to Red Onion State Prison. His medical record documents indicate that while at those facilities, he made "ongoing complaints of injuries to his right wrist from the November 4, 2014, incident" at Wallens Ridge. *Id.* at ¶ 17. Since his transfer, he has been evaluated by a specialist, has received an MRI and other diagnostic tests, and has undergone physical therapy, related to his right wrist.

## II. THE NON-MEDICAL DEFENDANTS.

### A. Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "In reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Williams*, 372 F.3d at 667.[3]

### B. Excessive Force Claims.

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). DePaolis' claims of excessive force arise under the Eighth Amendment, which protects prisoners from "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). An excessive force claim requires the prisoner to prove the official possessed a culpable state of mind (subjective component) and caused the prisoner a sufficiently serious deprivation or injury (objective component). *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

The prisoner must prove that, subjectively, the official acted "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320-21. Not every

---

[3] I have omitted internal quotation marks, alterations, and citations throughout this opinion, unless otherwise noted.

malevolent touch by a prison guard gives rise to an excessive force claim, however. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Factors relevant to proving malicious or sadistic intent include: (1) the need for force, (2) the degree of force used in relation to the need for force, (3) the existence of a threat reasonably perceived by the official, (4) any efforts made to lessen the severity of a forceful response, and (5) the extent of the prisoner's injury. *Id.* at 7. Courts must give "wide-ranging deference," *Whitley*, 475 U.S. at 321-22, to prison administrators "to design and implement policies and practices that in their judgment are necessary for the preservation of order and security" in the inherently dangerous prison environment. *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir. 1998).

The objective component of an Eighth Amendment claim asks whether the force applied was "nontrivial." *Wilkins*, 559 U.S. at 39. While the extent of the *injury* the inmate plaintiff suffered cannot, alone, be the deciding factor of his claim,

> [t]he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical *force*, provided that the use of force is not of a sort repugnant to the conscience of mankind. An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim.

*Id.* at 37-38. This aspect of the standard measures the force used against "contemporary standards of decency." *Hudson*, 503 U.S. at 8. When a prisoner forecasts evidence showing that the defendants "maliciously and sadistically use[d]

force to cause harm, contemporary standards of decency always are violated," and both factors of the standard are satisfied. *Id.* at 9. Accordingly, the extent of the inmate's injury is relevant to both the subjective and objective inquiries, as it "may suggest whether the use of force could plausibly have been thought necessary in a particular situation" or may "provide some indication of the amount of force applied." *Wilkins,* 559 U.S. at 37.

I conclude that the motions for summary judgment must be denied as to the majority of the non-medical defendants. Taking the evidence in the light most favorable to DePaolis, while he was safely locked behind a metal door, Byington and Hall maliciously yanked the tether to the handcuffs, causing DePaolis to injure his right hand even before he was ordered to remove his clothes for the strip search. Byington then twisted his arm as if trying to break it, and Hall emptied a can of mace on the inmate's arm, chest, face, and neck.

Because DePaolis did not immediately comply with King's orders to strip and comply with procedures to exit the shower, King threatened to have officers beat him. King then maced DePaolis for thirty seconds, causing the inmate a burning feeling. When DePaolis asked to speak with a superior officer, King ordered his officers to get DePaolis, as he had previously threatened to do.

The extraction team of Hall, Byington, Davis, and Ledford entered the shower, supervised by King and Smith. DePaolis was cowering in the corner,

soaking wet. Davis activated the NOVA shield and shocked him repeatedly, causing excruciating pain though out his body. When DePaolis moved the shield away, he accidently hit Davis's helmet, causing no injury. Davis placed DePaolis in a headlock and punched him many times in the face with his fist. The officers picked DePaolis up, slammed him to the ground, and Davis kicked him several times in the face. While held down, other officers punched and kicked him in the sides, although he was not resisting.

Once DePaolis was out of the shower, sitting on a table, King grabbed and lifted DePaolis' right hand up and out, making it pop painfully three or four times. During placement of the five-point restraints, King twisted DePaolis' right hand up and out, causing another pop in the wrist and excruciating pain. While DePaolis was in five-point restraints, Short tried three times to break the inmate's right pinky finger, causing severe pain.

According to DePaolis' evidence, he suffered severe pain during these events and sustained injuries. He contends that the defendants' manipulations of his right wrist caused pain and disability that is ongoing to this day, even after extensive medical testing and treatment.

The defendants dispute DePaolis' version of events. They argue that their actions were proportional to DePaolis' noncompliance with orders and his physical resistance to the officers' efforts to bring him safely under control and out of the

shower. At the summary judgment stage of the litigation, however, I cannot resolve such genuine issues of material dispute between the parties' accounts. DePaolis may be able to persuade a reasonable jury to find in his favor that these actions were malicious and sadistic, intended to cause harm, rather than good faith efforts to restore order. He may be able to persuade the jury that these defendants' uses of force were nontrivial. Accordingly, I must deny the defendants' motion as to DePaolis' claims of excessive force by Smith, Byington, Hall, King, Davis, Ledford, and Short.[4]

## C. Failure to Intervene.

Officer Hughes did not personally use force against DePaolis during the incidents on November 4, 2014. Yet he may face § 1983 liability as a bystander who failed to prevent others from violating DePaolis' rights.

> The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them. Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and [be] treated accordingly.

---

[4] When resolution of the qualified immunity question and the case itself both depend upon a determination of what actually happened, summary judgment on the ground of qualified immunity is not proper. *Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir. 1995). Accordingly, I must deny the defendants' motions seeking summary judgment on the ground of qualified immunity as well as on the merits of DePaolis' claims.

*Randall v. Prince George's Cty.,* 302 F.3d 188, 203 (4th Cir. 2002). Taking the evidence in the light most favorable to DePaolis, Hughes observed (and DePaolis told him about) King's use of force during the application of the five-point restraints. Yet, Hughes did not intervene. Hughes states that the officers' use of force was in response to DePaolis' combative actions and that no force was used during the five-point restraint process. I conclude that disputes, both material and genuine, preclude summary judgment for Hughes.

## D. Conspiracy.

"To establish a civil conspiracy under § 1983, [DePaolis] must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [a] deprivation of [his] constitutional right." *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421 (4th Cir. 1996). "While [he] need not produce direct evidence of a meeting of the minds, [he] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective. *Id.* He must present evidence that "reasonably lead[s] to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.*

In this case, DePaolis alleges that King and Smith conspired to fabricate disciplinary charges against him related to the events of November 4, 2014, to

write false facts in the incident reports and to edit the camera footage related to these events. DePaolis does not state facts, however, showing that these defendants formed any type of agreement or that they acted in concert to injure him in the alleged manner. Their mere participation in the disciplinary proceedings cannot prove unity of purpose between them as required to establish any conspiracy to violate his constitutional rights. Moreover, from DePaolis' allegations, it is clear that the disciplinary charges were supported by some evidence, and were thus not fabricated. *See Superintendent Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 455 (1985) (holding that "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits"). DePaolis also offers no facts by which he could prove that these defendants (or anyone) altered the relevant video footage. In any event, he fails to show any constitutionally protected right implicated by the alleged inaccuracies in the incident reports and/or the video footage.

DePaolis' conclusory assertions of a conspiracy are simply not sufficient to state a § 1983 claim and do not warrant further development. Accordingly, I will grant summary judgment for King and Smith on the conspiracy claim as a matter of law.

E.  Other Claims.

I find that the defendants are entitled to summary judgment as to some of DePaolis' contentions.  I will grant their motion accordingly, as to the following claims.

First, any claim for injunctive and declaratory relief was rendered moot by DePaolis' transfer away from Wallens Ridge, where the defendants in this case were employed.  As a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (finding transfer rendered moot prisoner's claims for injunctive and declaratory relief, but not claims for monetary damages).  Because DePaolis is no longer under the control of these Wallens Ridge officers, they cannot be ordered to provide him any prospective relief, such as an MRI.  In any event, the evidence in the record indicates that DePaolis has since been provided with an MRI and other treatment for his right wrist at other prisons.

Second, DePaolis cannot use a § 1983 action to have anyone criminally prosecuted, as he has requested in his demand for injunctive relief in this case.  An individual simply has no constitutional right to, or any judicially cognizable interest in, the prosecution or non-prosecution of another person.  *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973).

Third, DePaolis has no actionable § 1983 claim against Smith or McCray for threatening comments or gestures on the way to segregation. A defendant's words and gestures alone, even if offensive or threatening, cannot deprive an inmate of constitutional rights. *See, e.g., Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D.N.C. 1990) ("Words by themselves do not state a constitutional claim, without regard to their nature.").

Finally, DePaolis cannot sue any of the defendants in their official capacities for monetary damages. Neither a state nor its officers acting in their official capacities are "persons" under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989).

### III. DR. DULANEY.

#### A. Standard of Review.

In addressing Dr. Dulaney's Motion to Dismiss under Rule 12(b)(6), I must accept DePaolis' factual allegations as true and construe them in the light most favorable to him. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 189 (4th Cir. 2010). A motion to dismiss challenges the legal sufficiency of a plaintiff's complaint to determine whether he has properly stated a claim for relief. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To avoid dismissal, the "complaint must establish 'facial plausibility' by pleading 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged.'" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "When the complaint relies upon a document, whose authenticity is not challenged, such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

### B. The Statute of Limitations.

Federal civil rights actions under 42 U.S.C. § 1983 are governed by the general or residual statute of limitations for personal injuries in the state where the alleged constitutional violations occurred, regardless of the type of injury the plaintiff alleges. *See Owens v. Okure*, 488 U.S. 235, 239-40 (1989). DePaolis argues that his medical claim against Dr. Dulaney should be governed by Virginia's six-year statute of limitations for bringing such claims. In *Owens*, however, for the sake of consistency, the Supreme Court rejected the argument that the litigant could choose from among multiple personal injury statutes of limitations. *Id.* at 242-43. Instead, the Court held that "where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." *Id.* at 249-50.

Virginia's general or residual statute of limitations for personal injury cases is two years from the time when a cause of action accrues. Va. Code Ann. § 8.01-243(A). A federal claim accrues when the plaintiff knows enough about the harm done to him to bring his lawsuit. *See Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc). A prisoner's federal civil claim is deemed filed for purposes of a statute of limitations when he "delivers his pleading to prison authorities for forwarding to the court clerk." *Lewis v. Richmond City Police Dep't*, 947 F.2d 733, 735 (4th Cir. 1991). Thus, as long as the complaint is deemed filed in this manner within the limitations period, the action is timely. *Id.*

DePaolis alleges that Dr. Dulaney refused to order an MRI and prescribed Motrin for pain. His Complaint does not state the dates when the doctor evaluated him and/or ordered treatment for him. According to the exhibits to the Complaint, however, Dr. Dulaney last evaluated and recommended treatment for him on January 23, 2015. On that date, the doctor stated her intention to order a second X ray of DePaolis' right wrist to compare to the previous X ray. DePaolis refused this treatment, believing that she should have ordered an MRI. He then pursued a grievance complaining about Dr. Dulaney's refusal to order an MRI. The last level of appeal for that grievance was completed in early March 2015.

I conclude that at the latest, by early March 2015, DePaolis knew sufficient facts about the harm that Dr. Dulaney's acts or omissions had caused him to

initiate his claims against her in this lawsuit. *Nasim*, 64 F.3d at 955. When he filed his Complaint in September 2016, however, DePaolis did not identify the doctor as a defendant, although he clearly knew her identity. His motion seeking to add Dr. Dulaney as a defendant to the lawsuit was dated April 21, 2017. Even assuming that DePaolis delivered his motion to prison authorities for mailing to the court on that same day, *Lewis*, 947 F.2d at 735, he did not file his claims against Dr. Dulaney until more than two years after those claims accrued. He does not state any reason for his failure to file his claim against the doctor sooner, within the two-year filing period allowed under Va. Code Ann. § 8.01-243(A). Accordingly, DePaolis' claims against Dr. Dulaney are time-barred, and I will grant her Motion to Dismiss on that ground.

## IV. CONCLUSION.

For the reasons herein stated, it is hereby **ORDERED** as follows:

1.  Defendant Dr. Dulaney's Motion to Dismiss (ECF No. 88) is GRANTED, and the clerk shall terminate this defendant as a party to the action;

2.  Defendants' motions for summary judgment (ECF Nos. 46 and 79) are GRANTED IN PART AND DENIED IN PART. The motions are DENIED as to the claims for damages for excessive force by defendants Smith, Byington, Hall, King,

Davis, Ledford, and Short, in their individual capacities, and as to the claim for damages against defendant Hughes in his individual capacity for failure to intervene in the use of force. The motions are GRANTED as to all other claims against all other defendants, and the clerk shall terminate defendant McCray as a party to the action; and

3. The clerk shall SCHEDULE this case for a jury trial at the United States Courthouse in Abingdon, Virginia.

ENTER: March 19, 2018

/s/  James P. Jones
United States District Judge